# IN THE UNITED STATES DISTRICT COURT
## FOR THE SOUTHERN DISTRICT OF OHIO
### EASTERN DIVISION

ANDRE WADE,

       Petitioner,

       v.

WARDEN, BELMONT
CORRECTIONAL INSTITUTION,

       Respondent.

       **Case No. 2:17-cv-1101**
       **Judge Algenon L. Marbley**
       **Magistrate Judge Elizabeth P. Deavers**

## REPORT AND RECOMMENDATION

Petitioner, a state prisoner, brings this *Petition* for a writ of habeas corpus pursuant to 28 U.S.C. § 2254. This matter is before the Court on the *Petition*, Respondent's *Return of Writ*, and the exhibits of the parties. For the reasons that follow, the Magistrate Judge **RECOMMENDS** that this action be **DISMISSED**.

### Facts and Procedural History

The Ohio Seventh District Court of Appeals summarized the facts and procedural history of the case as follows:

> {¶ 3} Wade was indicted by a grand jury on one count of rape, R.C. 2907.02(A)(2), a first-degree felony; one count of possession of drugs, R.C. 2925.11(A) and (C)(4)(a), a fifth-degree felony; and one count of assault, R.C. 2903.13(A), a first-degree misdemeanor. Following final testing results from the Ohio Bureau of Criminal Investigation, the drug charge was amended to state a violation of subsection (C)(6)(a), also a fifth-degree felony. These charges stemmed from an incident involving Wade and two juveniles in the woods near Indian Creek High School in Wintersville. Wade retained counsel, was arraigned and entered pleas of not guilty and not guilty by reason of insanity (NGRI).

> {¶ 4} Following a defense request for competency and sanity evaluations, the trial court found Wade was incompetent to stand trial and issued an order to restore competency but Wade subsequently stipulated to his restoration to competency. Wade also waived his speedy trial rights.

{¶ 5} The matter proceeded to a jury trial where the following pertinent evidence was adduced. CD testified that in the afternoon he went for a walk in the woods near Indian Creek High School with his girlfriend, KS. Both were 17 years old at the time. While in the woods, the teenagers had sex. While this was occurring, Wade came upon them and claimed they were on his property and threatened to call police. CD apologized and offered to leave. Wade responded: "you're not going anywhere until she sucks my dick." CD responded: "no and she's only 17," and Wade hit him, knocking him to the ground. CD protested again, and Wade hit him a second time, again knocking him to the ground. Although CD weighs 305 pounds, much more than Wade did at the time, CD has a heart condition, which requires an implanted heart monitor.

{¶ 6} Because Wade was beating CD, KS said that she would do what Wade demanded: give Wade oral sex. Soon after KS began doing this, however, Wade demanded that he "wanted pussy." CD said no, and Wade knocked him down again. CD then pleaded with Wade by offering his phone, class ring, necklace or whatever he wanted. However, Wade wanted to have sex with KS. CD said he tried to defend KS without success. He testified Wade "said that he would kill me if she didn't do what he said and * * * he said that if we told anyone he would kill us too."

{¶ 7} Wade then engaged in vaginal intercourse with KS, ejaculating inside of her. Afterwards, Wade blew smoke in CD's face, and walked away; as he did so, CD called him "the N word."

{¶ 8} CD had bruising on his face, a black eye, and scratches on his neck as a result of the incident. Originally, CD thought the scratches might have come from a knife, but he admitted he never saw Wade with a knife.

{¶ 9} CD readily admitted at the beginning of his testimony that he lied during the preliminary hearing when he denied that he and KS were having sex in the woods that day when Wade came upon them. He explained he was trying to protect KS.

{¶ 10} KS testified; she confirmed CD's account of the incident, though her testimony was initially less definite about the precise nature of Wade's threats and the sequence of events. KS said she was giving CD oral sex in the woods when Wade found them and said they were on his property and threatened to call police unless she "did what he said." She said she did not remember anything else Wade said after that; and said she could not remember if Wade made other types of threats.

She recalled that Wade hit CD, then Wade fingered her and she gave Wade "a blow job." After that Wade hit CD again; while KS was "sitting there in shock." She eventually also had vaginal sex with Wade.

{¶ 11} KS's statement to police was presented to her by the prosecutor to help refresh her recollection of events, but was not admitted into evidence. KS confirmed she was concerned that Wade was hitting CD because CD has a heart

condition. She said she was afraid of leaving CD in the woods with Wade and therefore did not try to flee. She confirmed she did not consent to sexual activity with Wade.

{¶ 12} After he finished having sex with KS, Wade blew smoke in CD's face and tried to clean off KS and her pants by dipping them in water. When Wade left, CD and KS immediately ran to the high school, and reported the incident to a teacher, Lucinda Phillippi, who called 911 and the victims' parents. Phillippi testified CD appeared "stunned," and his face was swollen, red and bleeding. She said CD became more and more upset as he explained what happened, finally exclaiming: "Oh, my God, I just saw my girlfriend get raped in front of my very eyes[,]" after which time CD began kicking chairs and the bleachers. Phillippi said she did not talk much to KS as a group of girls had circled around her.

{¶ 13} Officer Anthony Moores testified he responded to the 911 call from the high school, spoke to CD and obtained a description of the suspect, which he radioed to Officer Shawn Gegick, who apprehended Wade in a cul-de-sac area near the woods were the assault took place. Gegick noticed blood on Wade's ear. Moores arrived soon thereafter to assist Gegick; during this time, Gegick obtained from Wade a folded-up dollar bill with a white powder inside. Camera footage taken from Moores' cruiser was played for the jury.

On the video, Wade admits that he fought with CD. Wade's father Alfred Wade came upon the scene as Wade was being arrested. Gegick testified he overheard Wade tell his father "he was walking through the woods, saw a guy and a girl having sex," and that the male called him a racial slur, so Wade walked over and knocked him out.

{¶ 14} On cross-examination of Gegick, as part of a line of questioning to try to cast doubt into KS's identification of Wade, defense counsel asked Gegick to read from his preliminary hearing testimony. Gegick read what KS had reported to him about the crimes.

{¶ 15} A video of Wade while he was in a holding cell was also played for the jury. On this video, Wade is seen stripping off all of his clothing.

{¶ 16} Lieutenant Jesse Kosegi testified that he tested the white powder found on the dollar bill confiscated from Wade during his arrest. The results of this preliminary field test were read to indicate the powder was cocaine. The powder was subsequently sent to BCI and was evaluated by forensic scientist Shervonne Bufford who testified that more conclusive laboratory tests revealed the powder was heroin.

{¶ 17} Meanwhile, CD and KS were transported to the hospital where an exam and rape kit was performed on KS by the sexual assault nurse examiner Marla Rockey. Without objection by the defense, Rockey testified about statements KS made to

her about the offenses, reading from her emergency room report. The report itself was also admitted into evidence.

{¶ 18} On cross, Rockney testified that there were no injuries to KS's genital or anal areas, and that KS's hair and clothing appeared neat. She noted that KS was "calm at first," but became "teary-eyed" after her family arrived at the hospital. She also testified that KS reported consensual sexual activity within 96 hours of the exam, listing the time as 16:45, which was the same time listed for the alleged rape.

{¶ 19} The rape kit was transported to the BCI office. BCI forensic scientist Christopher Smith testified that analysis performed on the rape kit evidence, confirmed Wade's DNA located inside K.S.'s vagina.

{¶ 20} CD and KS positively identified Wade as their assailant in a photographic "six-pack" line-up.

{¶ 21} CD and KS were not positive in their courtroom identifications of Wade, explaining he looked different in that he had shaved his beard and gained weight. However, Captain Louis Vandeborne of the Wintersville Police Department testified he had the six-pack line-up made for a blind administrator to give to the victims and that the person identified by KS and CD was in fact Wade. Vandeborne was able to positively identify Wade as the defendant in the courtroom.

{¶ 22} Because Wade had entered an NGRI plea, the State presented expert testimony to rebut Wade's assertions that he was legally insane at the time of the incident, specifically that of Dr. Howard A. Beazel, a forensic psychologist who performed competency and sanity evaluations on Wade. Dr. Beazel said he explained to Wade at the beginning of the sanity evaluation that Wade's participation was voluntary; that the evaluation was not confidential; and that a report would be provided to the court and counsel.

{¶ 23} Dr. Beazel explained that in order to determine whether someone meets the legal criteria for insanity at the time of the offense—that the defendant was suffering from a severe mental disease or defect at the time of the alleged offenses such that he was unable to know the wrongfulness of his actions—he needed to obtain a defendant's psychiatric records and interview the defendant to learn his account of the incident. Dr. Beazel testified that Wade initially told him he did not remember what happened in the woods that day, but eventually provided details. Over objections, Dr. Beazel said Wade admitted he hit CD, but claimed the sex with KS was consensual.

{¶ 24} Ultimately, based in part on Wade's account of the incident, and the fact that Wade made no mention of experiencing any psychotic symptoms at the time of the offenses, Dr. Beazel opined that although Wade suffered from chronic mental illness that could be severe at times, Wade was not legally insane at the time the offenses were committed.

{¶ 25} After the State rested, Wade moved for acquittal, which was overruled by the trial court. Via counsel, Wade also withdrew his NGRI plea. The trial court engaged in a brief colloquy with Wade about his decision.

{¶ 26} The defense first called Wintersville Police Chief Edward Laman to testify. He confirmed that while in a holding cell, Wade removed all of this clothing and was acting "disoriented." He said that as a result, per protocol, Wade was transported to the hospital for an assessment; a physician later released him for transport to the county jail. Laman was also questioned about the photo line-up and confirmed it was presented to the victims by Angela Household, who is his secretary and clerk of courts for the Wintersville Magistrate's Court. On cross, Laman explained that Householder qualifies as a blind administrator for the line-up because she had no knowledge of the suspect placed in the line-up.

{¶ 27} The defense also presented the testimony of Wade's father, Alfred Wade. He explained he had been trying for years to help manage his son's mental illness. Alfred lived nearby Indian Creek High School; Wade had been staying with him. He described some of the bizarre behavior that Wade exhibited while off of his medications during the time the offenses took place. On the day of the incident, Wade had gone to a job interview, then out with his cousin, and finally returned to Alfred's home. Unbeknownst to his father, Wade left the house for about 30 minutes. A neighbor came over to tell Alfred that Wade was being questioned by police nearby. Alfred asked Wade what happened and Wade said he had seen a male and female in the woods, told them to get off his property and that the "boy called him a n*gger," and as a result, Wade "started beating him up."

{¶ 28} Wade elected not to take the stand. The trial court had a brief discussion with him to ensure he understood his right to remain silent as well as his right to testify.

{¶ 29} After considering all of the evidence, the jury found Wade guilty of all of the indicted charges. Following a hearing, the trial court sentenced Wade to an aggregate prison term of 12 years, with five years of mandatory post-release control; Wade was also classified as a Tier III sex offender.

*State v. Wade*, 71 N.E.3d 311, 313-17 (Ohio App. 7th Dist. Dec. 22, 2016).  On appeal, Petitioner asserted that he was denied the effective assistance of counsel; that the trial court erred in permitting expert testimony about statements Petitioner made during the sanity evaluation; and that his rape conviction was against the manifest weight of the evidence and that the evidence was constitutionally insufficient to sustain his rape conviction.  *Id*. at 313.  On December 22, 2016, the

appellate court affirmed the judgment of the trial court. *Id*. On May 31, 2017, the Ohio Supreme Court declined to accept jurisdiction of the appeal. *State v. Wade*, 149 Ohio St.3d 1421 (2017).

On March 1, 2017, Petitioner filed an application to reopen the appeal pursuant to Ohio Appellate Rule 26(B), asserting that he had been denied the effective assistance of appellate counsel because his attorney failed to raise on appeal a claim of the denial of the effective assistance of trial counsel, and that the trial court violated due process when it failed to *sua sponte* instruct the jury on a lesser included offense. *See State v. Wade*, No. 14 JE 0036, 2017 WL 2437279 (Ohio App. 7th Dist. June 5, 2017). On June 5, 2017, the appellate court denied the Rule 26(B) application. *Id*. On October 11, 2017, the Ohio Supreme Court declined to accept jurisdiction of the appeal. *State v. Wade*, 150 Ohio St.3d 1455 (2017).

On December 20, 2017, Petitioner filed this *Petition* for a writ of habeas corpus pursuant to 28 U.S.C. § 2254. He asserts that he was denied the effective assistance of counsel because his attorney failed to object to bad character evidence, and failed to impeach witness[es] (claim one); that the trial court erred when it permitted admission of testimony from Petitioner in violation of Ohio law and the Fifth Amendment (claim two); that the evidence was constitutionally insufficient to sustain his rape conviction (claim three); that he was denied the effective assistance of trial counsel because his attorney failed to request a lesser included jury instruction on the offense of sexual battery (claim four); that he was denied a fair trial because the trial court failed to *sua sponte* instruct the jury on a lesser included offense (claim five); and that he was denied the effective assistance of appellate counsel because his attorney failed to advise him of the deadline for filing a petition for post-conviction relief, or raise a claim of the denial of the effective assistance of trial counsel (claim six). It is the position of the Respondent that Petitioner's claims are without merit.

**Standard of Review**

Because Petitioner seeks habeas relief under 28 U.S.C. § 2254, the standards of the Antiterrorism and Effective Death Penalty Act ("the AEDPA") govern this case. The United State Supreme Court has described AEDPA as "a formidable barrier to federal habeas relief for prisoners whose claims have been adjudicated in state court" and emphasized that courts must not "lightly conclude that a State's criminal justice system has experienced the 'extreme malfunction' for which federal habeas relief is the remedy." *Burt v. Titlow*, 571 U.S. 12, 20 (2013) (quoting *Harrington v. Richter*, 562 U.S. 86, 102 (2011)); *see also Renico v. Lett*, 559 U.S. 766, 773 (2010) ("AEDPA . . . imposes a highly deferential standard for evaluating state-court rulings, and demands that state court decisions be given the benefit of the doubt.") (internal quotation marks, citations, and footnote omitted).

The AEDPA limits the federal courts' authority to issue writs of habeas corpus and forbids a federal court from granting habeas relief with respect to a "claim that was adjudicated on the merits in State court proceedings" unless the state court decision either

> (1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or
>
> (2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding.

28 U.S.C. § 2254(d).

Further, under the AEDPA, the factual findings of the state court are presumed to be correct:

> In a proceeding instituted by an application for a writ of habeas corpus by a person in custody pursuant to the judgment of a State court, a determination of a factual issue made by a State court shall be presumed to be correct. The applicant shall have the burden of

rebutting the presumption of correctness by clear and convincing evidence.

28 U.S.C. § 2254(e)(1).

Accordingly, "a writ of habeas corpus should be denied unless the state court decision was contrary to, or involved an unreasonable application of, clearly established federal law as determined by the Supreme Court, or based on an unreasonable determination of the facts in light of the evidence presented to the state courts." *Coley v. Bagley*, 706 F.3d 741, 748 (6th Cir. 2013) (citing *Slagle v. Bagley*, 457 F.3d 501, 513 (6th Cir. 2006)), *cert. denied sub nom. Coley v. Robinson,* 134 S. Ct. 513 (2013). The United States Court of Appeals for the Sixth Circuit has summarized these standards as follows:

> A state court's decision is "contrary to" Supreme Court precedent if (1) "the state court arrives at a conclusion opposite to that reached by [the Supreme] Court on a question of law[,]" or (2) "the state court confronts facts that are materially indistinguishable from a relevant Supreme Court precedent and arrives" at a different result. *Williams v. Taylor*, 529 U.S. 362, 405, 120 S. Ct. 1495, 146 L.Ed. 2d 389 (2000). A state court's decision is an "unreasonable application" under 28 U.S.C. § 2254(d)(1) if it "identifies the correct governing legal rule from [the Supreme] Court's cases but unreasonably applies it to the facts of the particular . . . case" or either unreasonably extends or unreasonably refuses to extend a legal principle from Supreme Court precedent to a new context. *Id.* at 407, 529 U.S. 362, 120 S. Ct. 1495, 146 L.Ed. 2d 389.

*Id*. at 748–49. The burden of satisfying the AEDPA's standards rests with the petitioner. *See Cullen v. Pinholster*, 563 U.S.170, 181 (2011).

**Claim One**

In claim one, Petitioner asserts that he was denied the effective assistance of counsel, because his attorney failed to impeach witnesses or object to the admission of bad character evidence. The appellate court denied this claim:

In his first assignment of error, Wade asserts:

The failure of defense counsel to object timely, properly impeach witnesses, as well as other deficiencies resulted in prejudicial error and ineffective assistance of counsel.

{¶ 58} To prove ineffective assistance of counsel, the defendant must satisfy a two-prong test; that counsel's performance has fallen below an objective standard of reasonable representation, and that he was prejudiced by counsel's performance. *Strickland v. Washington*, 466 U.S. 668, 687, 104 S.Ct. 2052, 80 L.Ed.2d 674 (1984); *State v. Bradley*, 42 Ohio St.3d 136, 538 N.E.2d 373 (1989), at paragraph two of the syllabus. To demonstrate prejudice, the defendant must prove that, but for counsel's errors, the result of the trial would have been different. *Id.*, paragraph three of the syllabus. In Ohio, a properly licensed attorney is presumed to be competent and the burden is on the defendant to prove otherwise. *State v. Hamblin*, 37 Ohio St.3d 153, 155, 524 N.E.2d 476 (1988).

{¶ 59} Wade asserts trial counsel's representation was deficient in three areas: during opening statements, cross-examination of witnesses, and in her questioning of the State's expert. Each will be discussed in turn, and discussion of overall prejudice will be reserved until the end.

{¶ 60} First, the prosecutor referred to Wade as a "sexual predator" eight times during his opening statement, despite the fact that Wade had never been previously convicted of any sex crimes. Defense counsel failed to object to the use of this term and did not bring it to the trial court's attention until after the conclusion of the opening statement, when, during a side-bar, outside of the presence of the jury, she requested a mistrial based upon the prosecutor's use of the term. The trial court then asked counsel why she failed to object after the first time the term was used, to which she replied she was unaware that one could object during an opening statement. The trial court stated he would have sustained her objection "in a second," had she made it at the appropriate time; and went on to explain: "There is no time that you're not allowed to object." However, counsel did request a curative instruction be given to the jury, which the trial court granted, telling jurors: "to the extent that the term sexual predator implies a prior sexual conviction, that is not the case here. So, we don't want anyone confused or mislead. [sic]."

{¶ 61} "Sexual predator" is a legal term of art that was used in a prior version of Ohio's sex offender statute, known as Meghan's Law, and was defined as "a person who has been convicted of or pleaded guilty to committing a sexually oriented offense and is likely to engage in the future in one or more sexually oriented offenses." *State v. Cook*, 83 Ohio St.3d 404, 407, 700 N.E.2d 570 (1998), quoting former R.C. 2950.01(E).

{¶ 62} This label does not apply to Wade as he had no prior sex offense convictions, and thus defense counsel should have objected when those statements were made, instead of waiting until the end of the prosecutor's opening statement to move for

a mistrial. Counsel's confusion about basic aspects of trial procedure falls below an objective standard of reasonable representation.

{¶ 63} Second, there are a number of instances where defense counsel attempted to impeach the victim, KS, improperly. First, the trial court had to instruct defense counsel, in the presence of the jury, on how to use a prior inconsistent statement:

THE COURT: Here's what you can do. You can ask her what happened. If what she said is different than a prior statement, then you can ask her about the prior statement but you don't start out with the prior statement. You start out with just asking her the question straight up.

{¶ 64} Despite this instruction, defense counsel resumed questioning the victim improperly:

Q. You're saying that he made you perform oral sex on him, the blow job thing.

A. Yes, with his threats.

Q. At one point you say as soon as you had the—

[PROSECUTOR]: Your Honor, I'm going to object again on the grounds that she's reading this from the doctor's report and the doctor's not here.

{¶ 65} The trial court then had the attorneys approach the bench and had to instruct defense counsel a second time about how to properly impeach using prior inconsistent statements:

THE COURT [to defense counsel]: What are you doing?

DEFENSE COUNSEL: I am trying to establish that she has given us a lot of stories that have indicated—

THE COURT: Okay. Here's how you do that and it's in the rules of evidence and you are going to follow them. You ask a question. "Did this happen?" She says "No." She said yes some other time. You say "Well, didn't you tell the doctor that that's what happened?" That's how you do it. You don't start "Did you tell the doctor this and did you tell the doctor that?" We are going to follow the rules. We are going to do it right.

DEFENSE COUNSEL: Okay.

THE COURT: Okay. Now, I've told you once and I told you nicely the first time. Now I'm telling you less nicely.

DEFENSE COUNSEL: Okay. Let me see if I understand what you are saying.

THE COURT: It's called a prior inconsistent statement. There's a rule on that. The rule says you ask the question, then if you get an answer that's different than the prior statement, then you ask about the prior statement and that's what we are going to do and we're not going to go line by line.

DEFENSE COUNSEL: Okay. Okay. I will try—I will try to—

THE COURT: Huh?

DEFENSE COUNSEL: I will try to see if I can get my head around that. I understand what you are saying. I need to figure out how to do that.

THE COURT: This is something you should already know before you get here. I might need to remind you but I shouldn't have to explain it to you. You should know that before you get here.

DEFENSE COUNSEL: I thought I had it but I apparently don't. So, I appreciate what you are saying.

THE COURT: Do we understand how we are going to do this?

DEFENSE COUNSEL: Yes, sir.

THE COURT: And I think you're digging yourself a hole with this Jury but that's your business.

DEFENSE COUNSEL: Okay.

{¶ 66} Third, the trial court had to explain to defense counsel how to question an expert witness, including the proper use of a hypothetical question. On one occasion, out of the hearing of the jury, the trial court stated:

You get two choices. You get to stick to the record of whatever is in there you can ask him about or you can ask hypothetical questions. You can say "If this was going on or if that was going on" but what you're not going to do is stand at the podium and tell him [the expert, Dr. Beazel] that he [Wade] was taking off his clothes and he was doing this and he was doing that, you know, because you say so. That is not what we're going to do.

{¶ 67} Even after this instruction, the trial court had to help counsel correctly formulate the questions, step by step.

DEFENSE COUNSEL [to Dr. Beazel]: You observed him on that day. That's the day 4–5–2013. At that time he tells me that he had been off his meds for some years. His brother was in the process of dying. He had been in a verbally-abusive

relationship with a woman and he was not getting to see his kids, all compounded together.

PROSECUTOR: Your honor, I'm not sure where these facts are coming from.

THE COURT: Right. Where are you getting all this? I don't know that any of this is in the record.

DEFENSE COUNSEL: He tells me.

THE COURT: Excuse me?

DEFENSE COUNSEL: Hypothetically.

THE COURT: All right. Hypothetical question. Go ahead.

DEFENSE COUNSEL: Given that hypothetical—

THE COURT: Assuming those facts to be true.

DR. BEAZEL: Yes, sir.

DEFENSE COUNSEL: —what is your opinion?

{¶ 68} Thus, there were three instances where trial counsel's performance was subpar, meeting the first prong of the *Strickland* test. Next, we must decide whether there was prejudice. Here we find none.

{¶ 69} The evidence against Wade, as set forth in detail above—the victims' testimony, Wade's DNA evidence found inside of KS, the injuries to CD and the victims' behavior testified to by witnesses who encountered them immediately after the incident, statements Wade made to his father—strongly support the jury's guilty verdicts. For example, during sentencing, the trial court noted how afraid KS appeared on the stand, stating: "I watched for a hour with her on the stand shaking and quivering and obviously greatly affected. * * * It's horrible. She shook for an hour on the stand."

{¶ 70} That counsel's missteps permeated the trial gives us pause. It is troubling that counsel lacked the ability to properly cross-examine and impeach the victim and expert witness, and that she failed to grasp basic aspects of trial procedure. While ineffectiveness at this level could result in prejudice in another case where— mindful that the State's burden of proof is beyond a reasonable doubt—the evidence is not as strong, we find no prejudice here given the overwhelming evidence against Wade.

{¶ 71} . . . . Although there were several errors made by defense counsel throughout the trial that fall below an objective standard of reasonable representation, no prejudice resulted. Accordingly, the judgment of the trial court is affirmed.

*State v. Wade*, 71 N.E.3d at 322-25.

"In all criminal prosecutions," the Sixth Amendment affords "the accused . . . the right . . . to Assistance of Counsel for his defence." U.S. Const. amend. VI. "Only a right to 'effective assistance of counsel' serves the guarantee." *Couch v. Booker*, 632 F.3d 241, 245 (6th Cir. 2011) (citation omitted). The United States Supreme Court set forth the legal principals governing claims of ineffective assistance of counsel in *Strickland v. Washington*, 466 U.S. 556 (1984). *Strickland* requires a petitioner claiming ineffective assistance of counsel to demonstrate that his counsel's performance was deficient and that he suffered prejudice as a result. 466 U.S. at 687; *Hale v. Davis*, 512 F. App'x. 516, 520 (6th Cir. 2013). A petitioner "show[s] deficient performance by counsel by demonstrating 'that counsel's representation fell below and objective standard of reasonableness." *Poole v. MacLaren*, 547 F. App'x 749, 754 (6th Cir. Dec. 5, 2013) (quoting *Davis v. Lafler*, 658 F.3d 525, 536 (6th Cir. 2011) (internal quotation marks omitted) and citing *Strickland*, 466 U.S. at 687). To make such a showing, a petitioner "must overcome the 'strong [ ] presum[ption]' that his counsel 'rendered adequate assistance and made all significant decisions in the exercise of reasonable professional judgment." *Poole*, 547 F. App'x at 754 (quoting *Strickland*, 466 U.S. at 687). "To avoid the warping effects of hindsight, [courts must] 'indulge a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance.'' *Bigelow v. Haviland*, 576 F.3d 284, 287 (6th Cir. 2009) (quoting *Strickland*, 466 U.S. at 689).

The United States Supreme Court has cautioned federal habeas courts to "guard against the danger of equating unreasonableness under *Strickland* with unreasonableness under § 2254(d)."

*Harrington v. Richter*, 562 U.S. 86, 105 (2011). The Court observed that while "'[s]urmounting *Strickland's* high bar is never an easy task, . . . [e]stablishing that a state court's application of *Strickland* was unreasonable under § 2254(d) is all the more difficult. . . ." *Id.* (quoting *Padilla v. Kentucky*, 559 U.S. 356,371-72 (2010) and citing *Strickland*, 466 U.S. at 689)). The Court instructed that the standards created under *Strickland* and § 2254(d) are both "'highly deferential,' and when the two apply in tandem, review is 'doubly' so." *Id.* (citations omitted).

Thus, when a federal habeas court reviews a state court's determination regarding an ineffective assistance of counsel claim, "[t]he question is not whether counsel's actions were reasonable. The question is whether there is any reasonable argument that counsel satisfied *Strickland's* deferential standard." *Id.* Under this deferential standard of review, Petitioner has failed to establish that he is entitled to relief. This Court is not persuaded that the appellate court's determination that Petitioner cannot establish prejudice, due to the substantial evidence of guilt, is so unreasonable so as to warrant relief.

Notably, even where a defendant shows that particular errors of counsel were unreasonable, he must also show that they actually had an adverse effect on the defense. *Strickland,* 466 U.S. at 693. "It is not enough for the defendant to show that the errors had some conceivable effect on the outcome of the proceeding." *Id.* He "must show that there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." *Id.* at 694.

Petitioner argues that he suffered prejudice from the prosecutor's reference to him as a sexual predator during opening statement, because the trial court never advised the jury to disregard those comments. Reply (ECF No. 13, PAGEID # 834.) However, the trial court explicitly advised the jury that Petitioner had no prior sexual offense convictions, thereby curing

any potential prejudicial misunderstanding by the jurors on this basis. Petitioner also argues that he suffered prejudice from his attorney's inadequate performance during cross-examination, in view of the lack of evidence regarding his use or threat of force. *Reply* (ECF No. 13, PAGEID # 834.) However, the record reflects ample evidence regarding the use or threat of force. The alleged victim testified that when Petitioner confronted her, he hit her boyfriend, threatened her, told her he was Satan, and forced her to have sex with him, so she did what he wanted. *Transcript* (ECF No. 9-3, PAGEID # 526, 530.) She watched him beat her boyfriend, who had a heart condition, and was afraid to leave him alone with the Petitioner. (PAGEID # 528.) She felt she had no option but to have sex with the Petitioner, because he threatened to kill her boyfriend or she thought that he would do so because "he was crazy." (PAGEID # 529-30.) She made a similar statement to the nurse practitioner shortly after commission of the offenses charged. (PAGEID # 509.) CD also testified that, when Petitioner approached them, he told them that they could not leave until she consented to sexual activity. (PAGEID # 554.) Petitioner hit CD, repeatedly, knocking and beating CD to the ground. (PAGEID # 554-56.) Petitioner threatened to kill CD if his girlfriend did not comply with his demands. (PAGEID # 558.) This testimony, as well as the DNA evidence and facts to which the state appellate court referred, constituted substantial evidence of guilt. Contrary to Petitioner's allegation here, the record reflects that the trial court instructed defense counsel on impeaching the alleged victim with a prior inconsistent statement and questioning the State's expert outside of the hearing of the jury. (See PAGEID # 547-49; 597-99). Notably, Petitioner does not refer to, and the record does not reflect, that counsel was unable or prevented from conducting any additional cross-examination that would have assisted the Petitioner.[1]

---

[1] Petitioner does assert that defense counsel should have admitted other prior inconsistent statements by C.D. at the preliminary hearing. *Reply* (ECF No. 13, PAGEID # 836.) However, Petitioner does not indicate, and this Court is unable to determine from the record, the nature of

Claim one is without merit.

**Claim Two**

In claim two, Petitioner asserts that the trial court erred in allowing testimony in violation of O.R.C. § 2945.371(J), and the Fifth Amendment. Petitioner has withdrawn this claim. See Reply (ECF No. 13, PAGEID # 837.)

**Claim Three**

In claim three, Petitioner asserts that the evidence is constitutionally insufficient to sustain his rape conviction. The state appellate court rejected this claim in relevant part as follows:

> {¶ 31} "A challenge to the sufficiency of the evidence tests whether the state has properly discharged its burden to produce competent, probative, evidence on each element of the offense charged." *State v. Petefish*, 7th Dist. No. 10 MA 78, 2011-Ohio-6367, 2011 WL 6163971, ¶ 16. Thus, sufficiency is a test of adequacy. *State v. Thompkins,* 78 Ohio St.3d 380, 386, 678 N.E.2d 541 (1997). Whether the evidence is legally sufficient to sustain a verdict is a question of law. *Id.* In reviewing the record for sufficiency, the relevant inquiry is whether, after viewing the evidence in a light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime proven beyond a reasonable doubt. *State v. Smith*, 80 Ohio St.3d 89, 113, 684 N.E.2d 668 (1997).

> \*\*\*

> {¶ 34} Wade challenges only his rape conviction under R.C. 2907.02(A)(2), which provides: "No person shall engage in sexual conduct with another when the offender purposely compels the other person to submit by force or threat of force."

> {¶ 35} "'Sexual conduct' means vaginal intercourse between a male and female; anal intercourse, fellatio, and cunnilingus between persons regardless of sex; and, without privilege to do so, the insertion, however slight, of any part of the body or any instrument, apparatus, or other object into the vaginal or anal opening of another. Penetration, however slight, is sufficient to complete vaginal or anal intercourse." R.C. 2907.01(A).

> {¶ 36} The Revised Code defines "force" as "any violence, compulsion, or constraint physically exerted by any means upon or against a person or thing." R.C.

---

those statements. It is not this Court's duty to scour the record om search of support for Petitioner's claims. *United States v. Matsa*, Nos. 2:15-cv-700, 2:09-cr-297, 2017 WL 4469120, at \*10 (S.D. Ohio Oct. 6, 2017) (citations omitted).

2901.01(A)(1). "R.C. 2907.02 only requires that minimal force or threat of force be used in the commission of a rape." *State v. Taylor*, 7th Dist. No. 15 JE 0009, 2016-Ohio-2927, 2016 WL 2746902, ¶ 13, citing *State v. Eskridge*, 38 Ohio St.3d 56, 58, 526 N.E.2d 304 (1988). "'Force need not be overt and physically brutal, but can be subtle and psychological. As long as it can be shown that the rape victim's will was overcome by fear or duress, the forcible element of rape can be established.'" *Eskridge,* 38 Ohio St.3d at 58–59, 526 N.E.2d 304, quoting *State v. Fowler*, 27 Ohio App.3d 149, 154, 500 N.E.2d 390 (8th Dist.1985).

{¶ 37} CD testified that Wade hit him repeatedly and threatened to kill both KS and CD unless KS had sex with Wade. CD further testified that Wade engaged in oral and vaginal intercourse with KS, ejaculating inside of her. KS testified she was scared of Wade and did not want to leave CD alone with him in the woods. She confirmed she did not consent to sex with Wade. When analysis was performed on the rape kit evidence obtained from KS, it was confirmed that Wade's DNA was present inside K.S.'s vagina. Thus, there was sufficient evidence to support a conviction of rape in violation of R.C. 2907.02(A)(2).

{¶ 38} With regard to manifest weight, the evidence overall, including the witness testimony, DNA evidence and the photographs of injuries to CD, strongly supports the State's version of events that: Wade came upon the two teenagers in a compromising position in the woods; Wade punched CD and threatened both of them, in order to engage in oral and vaginal sex with KS; and KS only complied out of fear. By contrast, the defense's theory of the case was that Wade beat CD only after CD yelled racial slurs at Wade; and that KS consented to sex with Wade, a stranger who happened upon the couple in the woods. It was up to the jury, based upon the evidence presented, to determine which version of events was more plausible, and in doing so to resolve matters of credibility. Based upon the record, the jury did not lose its way so as to create a manifest miscarriage of justice.

{¶ 39} For all of these reasons, the jury's verdict on the rape count is supported by sufficient evidence. . . . Accordingly, Wade's. . . assignment[] of error [is] meritless.

*State v. Wade*, 71 N.E.3d at 317-18.

Before a criminal defendant can be convicted consistent with the United States Constitution, there must be evidence sufficient to justify a reasonable trier of fact to find guilt beyond a reasonable doubt. *Jackson v. Virginia*, 443 U.S. 307, 319 (1979). In determining whether the evidence was sufficient to support a petitioner's conviction, a federal habeas court must view the evidence in the light most favorable to the prosecution. *Wright v. West*, 505 U.S. 277, 296 (1992) (citing *Jackson*, 443 U.S. at 319). The prosecution is not affirmatively required

to "rule out every hypothesis except that of guilt." *Id.* (quoting *Jackson*, 443 U.S. at 326). "[A] reviewing court 'faced with a record that supports conflicting inferences must presume—even if it does not appear on the record—that the trier of fact resolved any such conflicts in favor of the prosecution, and must defer to that resolution.'" *Id.* (quoting *Jackson,* at 326).

Moreover, federal habeas courts must afford a "double layer" of deference to state court determinations of the sufficiency of the evidence. As explained in *Brown v. Konteh*, 567 F.3d 191, 205 (6th Cir. 2009), deference must be given, first, to the jury's finding of guilt because the standard, announced in *Jackson v. Virginia*, is whether "viewing the trial testimony and exhibits in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." Second, and even if a *de novo* review of the evidence leads to the conclusion that no rational trier of fact could have so found, a federal habeas court "must still defer to the state appellate court's sufficiency determination as long as it is not unreasonable." *White v. Steele*, 602 F.3d 707, 710 (6th Cir. 2009). This is a substantial hurdle for a habeas petitioner to overcome, and plainly, Petitioner cannot do so here.

The testimony of the alleged victim, alone, constitutes constitutionally sufficient evidence to sustain Petitioner's conviction on rape. The state appellate court's determination in this regard was clearly reasonable.

Claim three plainly lacks merit.

**Claims Four and Six**

It is the position of the Respondent that Petitioner has procedurally defaulted claims four and six.

**Procedural Default**

In recognition of the equal obligation of the state courts to protect the constitutional rights of criminal defendants, and in order to prevent needless friction between the state and federal courts, a state criminal defendant with federal constitutional claims is required to present those claims to the highest court of the state for consideration. 28 U.S.C. § 2254(b), (c). If the petitioner fails to do so, but the state still provides a remedy to pursue, his or her petition is subject to dismissal for failure to exhaust state remedies. *Id.; Coleman v. Thompson*, 501 U.S. 722, 731 (1991); *Deitz v. Money*, 391 F.3d 804, 808 (6th Cir. 2004).

If, because of a procedural default, the petitioner can no longer present the relevant claims to a state court, the petitioner also waives the claims for purposes of federal habeas review unless he or she can demonstrate cause for the procedural default and actual prejudice resulting from the alleged constitutional error. *Edwards v. Carpenter*, 529 U.S. 446, 451 (2000); *Coleman*, 501 U.S. at 724; *Murray v. Carrier*, 477 U.S. 478, 485 (1986).

In the Sixth Circuit, a court must undertake a four-part analysis to determine whether procedural default is a bar to a habeas petitioner's claims. *Maupin v. Smith*, 785 F.2d 135, 138 (6th Cir. 1986); *see also Scuba v. Brigano*, 259 F. App'x 713, 718 (6th Cir. 2007) (following the four-part analysis of *Maupin*). Specifically, the United States Court of Appeals for the Sixth Circuit requires the district courts to engage in the following inquiry:

> First, the court must determine that there is a state procedural rule that is applicable to the petitioner's claim and that the petitioner failed to comply with the rule. . . .Second, the court must decide whether the state courts actually enforced the state procedural sanction. . . .Third, the court must decide whether the state procedural forfeiture is an adequate and independent state ground on which the state can rely to foreclose review of a federal constitutional claim.

*Maupin,* 785 F.2d at 138 (internal quotations omitted). Finally, if "the court determines that a state procedural rule was not complied with and that the rule [has] an adequate and independent state

ground, then the petitioner" may still obtain review of his or her claims on the merits if the petitioner establishes: (1) a substantial reason to excuse the default and (2) that he or she was actually prejudiced by the alleged constitutional error. *Id.* "Cause" under this test "must be something external to the petitioner, something that cannot fairly be attributed to him[;]. . . some factor external to the defense [that] impeded [ ] efforts to comply with the State's procedural rule." *Coleman*, 501 U.S. at 753. This "cause and prejudice" analysis also applies to failure to raise or preserve issues for review at the appellate level or failure to appeal at all. *Id.* at 750.

Nevertheless, "'[i]n appropriate cases' the principles of comity and finality that inform the concepts of cause and prejudice 'must yield to the imperative of correcting a fundamentally unjust incarceration.'" *Murray*, 477 U.S. at 495 (quoting *Engle v. Isacc*, 456 U.S. 107, 135 (1892)). Petitioners who fail to show cause and prejudice for procedural default may nonetheless receive a review of their claims if they can demonstrate that a court's refusal to consider a claim would result in a "fundamental miscarriage of justice." *Coleman*, 501 U.S. at 750; *see also Lott v. Coyle,* 261 F.3d 594, 601–02 (6th Cir. 2001) (same). The fundamental miscarriage of justice exception requires a showing that "in light of the new evidence, no juror, acting reasonably, would have voted to find him guilty beyond a reasonable doubt." *Schlup v. Delo*, 513 U.S. 298, 329 (1995).

In claim four, Petitioner asserts that he was denied the effective assistance of trial counsel, because his attorney failed to request a jury instruction on the lesser included offense of sexual battery. Petitioner failed to raise this claim on direct appeal, where he was represented by new counsel. Further, he may now no longer do so, under Ohio's doctrine of *res judicata. See State v. Cole*, 2 Ohio St.3d (1982); *State v. Ishmail*, 67 Ohio St.2d 16 (1981); *State v. Perry*, 10 Ohio St.2d 175 (1967) (claims must be raised on direct appeal, if possible, or they will be barred by the

doctrine of *res judicata*). The state courts were never given an opportunity to enforce the procedural rule at issue due to the nature of Petitioner's procedural default.

Ohio's doctrine of *res judicata* in this context is adequate and independent under the third part of the *Maupin* test. To be "independent," the procedural rule at issue, as well as the state court's reliance thereon, must rely in no part on federal law. *Coleman v. Thompson*, 501 U.S. 722, 732–33 (1991). To be "adequate," the state procedural rule must be firmly established and regularly followed by the state courts. *Ford v. Georgia*, 498 U.S. 411 (1991). "[O]nly a 'firmly established and regularly followed state practice' may be interposed by a State to prevent subsequent review by this Court of a federal constitutional claim." *Id.* at 423 (quoting *James v. Kentucky*, 466 U.S. 341, 348–351 (1984)); *see also Barr v. City of Columbia*, 378 U.S. 146, 149 (1964); *NAACP v. Alabama ex rel. Flowers*, 377 U.S. 288, 297 (1964); *see also Jamison v. Collins*, 100 F. Supp. 2d 521, 561 (S.D. Ohio 1998).

The Sixth Circuit has consistently held that Ohio's doctrine of *res judicata, i.e.,* the *Perry* rule, is an adequate ground for denying federal habeas relief. *Lundgren v. Mitchell*, 440 F.3d 754, 765 (6th Cir. 2006); *Coleman v. Mitchell*, 268 F.3d 417, 427–29 (6th Cir. 2001); *Seymour v. Walker*, 224 F.3d 542, 555 (6th Cir. 2000); *Byrd v. Collins*, 209 F.3d 486, 521–22 (6th Cir. 2000); *Norris v. Schotten*, 146 F.3d 314, 332 (6th Cir. 1998). Ohio courts have consistently refused, in reliance on the doctrine of *res judicata*, to review the merits of claims because they are procedurally barred. *See State v. Cole*, 2 Ohio St.3d at 112; *State v. Ishmail*, 67 Ohio St.2d at 16. Additionally, the doctrine of *res judicata* serves the state's interest in finality and in ensuring that claims are adjudicated at the earliest possible opportunity. With respect to the independence prong, the Court concludes that Ohio's doctrine of *res judicata* in this context does not rely on or

otherwise implicate federal law.  Accordingly, the Court is satisfied from its own review of relevant case law that the *Perry* rule is an adequate and independent ground for denying relief.

Petitioner may still secure review of his claims on the merits if he demonstrates cause for his failure to follow the state procedural rules, as well as actual prejudice from the constitutional violations that he alleges.

> "'[C]ause' under the cause and prejudice test must be something external to the petitioner, something that cannot fairly be attributed to him[;]. . . some objective factor external to the defense [that] impeded. . . efforts to comply with the State's procedural rule." *Coleman v. Thompson*, 501 U.S. 722, 753, 111 S.Ct. 2546, 115 L.Ed.2d 640 (1991).

*Maples v. Stegall*, 340 F.3d 433, 438 (6th Cir. 2003).  The constitutionally ineffective assistance of counsel may constitute cause for a procedural default, so long as such claim has been presented to the state courts and is not, itself, procedurally defaulted.  *Edwards v. Carpenter*, 529 U.S. 446, 451-52 (2000) (citing *Murray v. Carrier*, 477 U.S. 478, 488–89 (1986)).  The Court presumes that Petitioner asserts, as cause for his procedural default of claim four, the denial of the effective assistance of appellate counsel.  He raises this same allegation in habeas corpus claim six. However, the appellate court denied Petitioner's Rule 26(B) application for failure to comply with Appellate Rule 26(B)(2)(e):

> Although Wade's timely application includes a sworn statement, he failed to provide the portions of the record upon which he relies and cites throughout his application.  "App.R. 26(B)(2)(e) places the responsibility squarely upon the applicant to provide the court of appeals with such portions of the record as are available to him."  Where an applicant fails to do so, "his application [is] properly denied."  *State v. McNeill*, 83 Ohio St.3d 457, 459, 700 N.E.2d 613 (1998).  Wade has not satisfied these requirements; thus, we need not reach the merits of his arguments.

*State v. Wade*, 2017 WL 2437279, at *1.  Petitioner thereby likewise has procedurally defaulted his claim of the denial of the effective assistance of appellate counsel.  *See Schwab v. Warden,* No. 2:15-cv-0491, 2017 WL 2972148, at *2 (S.D. Ohio July 12, 2017) (citing *Hutchison v. Warden*,

*London Corr. Inst.*, No. 1:14-cv-874, 2015 WL 6798550 (S.D. Ohio Nov. 6, 2015)). The state appellate court's alternative ruling on the merits does not preclude enforcement of the procedural default. *See Skatzes v. Warden, Mansfield Corr. Inst.*, No. 3:09-cv-289, 2017 WL 2374434, at *7-8 (S.D. Ohio June 1, 2017) (citing *Harris v. Reed*, 489 U.S. 255, 264 (1989); *Scott v. Mitchell*, 209 F.3d 854 (6th Cir. 2000); *Wogenstahl v. Mitchell*, 668 F.3d 307, 327 (6th Cir. 2012); *Bowling v. Parker*, 344 F.3d 487, 498 (6th Cir. 2003)). The denial of the effective assistance of appellate counsel cannot constitute cause for his procedural default, because he has likewise procedurally defaulted that claim. *Edwards v. Carpenter*, 529 U.S. at 451-52 (the constitutionally ineffective assistance of counsel may constitute cause for a procedural default, so long as the claim has been presented to the state courts and is not, itself, procedurally defaulted).

Claims four and six are procedurally defaulted.

**Claim Five**

In claim five, Petitioner asserts that he was denied a fair trial because the trial court failed to *sua sponte* issue a jury instruction on a lesser included offense. Petitioner has withdrawn this claim for review. *Reply* (ECF No. 13, PAGEID # 846.)

**Recommended Disposition**

Therefore, the Magistrate Judge **RECOMMENDS** that this action be **DISMISSED**.

<u>**Procedure on Objections**</u>

If any party objects to this *Report and Recommendation*, that party may, within fourteen days of the date of this Report, file and serve on all parties written objections to those specific proposed findings or recommendations to which objection is made, together with supporting authority for the objection(s). A judge of this Court shall make a *de novo* determination of those portions of the report or specified proposed findings or recommendations to which objection is

made.  Upon proper objections, a judge of this Court may accept, reject, or modify, in whole or in part, the findings or recommendations made herein, may receive further evidence or may recommit this matter to the magistrate judge with instructions.  28 U.S.C. § 636(B)(1).

The parties are specifically advised that failure to object to the *Report and Recommendation* will result in a waiver of the right to have the district judge review the *Report and Recommendation de novo,* and also operates as a waiver of the right to appeal the decision of the District Court adopting the *Report and Recommendation.  See Thomas v. Arn*, 474 U.S. 140 (1985); *United States v. Walters*, 638 F.2d 947 (6th Cir. 1981).

The parties are further advised that, if they intend to file an appeal of any adverse decision, they may submit arguments in any objections filed, regarding whether a certificate of appealability should issue.

 s/ *Elizabeth A. Preston Deavers*
Elizabeth A. Preston Deavers
Chief United States Magistrate Judge